UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                            :

IRVIN LEE PATRICK,               :

                      :

         Plaintiff,      :

                      :       05 Civ. 5206 (GEL)

        v.               :

                      :     **OPINION AND ORDER**

WARDEN ANTHONY AMICUCCI,   :

WESTCHESTER COUNTY DEPARTMENT  :

OF CORRECTIONS, CORRECTIONAL  :

OFFICER BENDER, CORRECTIONAL  :

OFFICER "JOHN DOE,"and SERGEANT  :

MCGUIRE,                :

                      :

         Defendants.    :

                      :

-------------------------------------------------------------x

Irvin Lee Patrick, pro se.

Jane Hogan Felix, Senior Assistant County
Attorney (Charlene M. Indelicato, Westchester
County Attorney, on the brief), White Plains, New
York, for defendants Warden Anthony Amicucci,
Westchester County Department of Corrections,
Correctional Officer Bender, and Sergeant
McGuire.


GERARD E. LYNCH, District Judge:

      Plaintiff Irvin Lee Patrick brings this civil rights action against the Westchester County

Department of Corrections, and against Warden Anthony Amicucci, Correctional Officer

Bender, and Sergeant McGuire in their individual capacities, pursuant to 42 U.S.C. § 1983.

Patrick alleges that the defendants violated his constitutional rights by their deliberate

indifference to his physical security and medical needs.  Defendants now move for summary

judgment, which will be granted in part and denied in part.

**BACKGROUND**

On November 22, 2004, while a pretrial detainee being held in the housing unit known as 3 Northeast in the Westchester County Jail, Irvin Lee Patrick was the victim of an unprovoked assault by Kenneth Hill, who was also housed in the facility.  The injuries that Patrick sustained from the attack were serious: he suffered a fractured jaw and a broken cheekbone, and ultimately needed surgery in which a metal plate and six or more screws were inserted into his face to repair the damage.

At his deposition, Patrick firmly asserted that he had no difficulties "whatsoever" with Hill before the assault.  (Dep. Tr., Hogan Felix Ex. A, at 45.)  He had never indicated to defendants before the attack that he feared any particular inmate, since he "never had any problems with anybody on [his] unit, not even [Hill]."  (Id. 41-42.)  Since "nobody had threatened [him] or anything like that," he had not requested a transfer from his housing unit or asked to be placed in protective custody. (Id. 44-45.)

Patrick had, however, allegedly complained to each of the three individual defendants (Warden Anthony Amicucci, Correctional Officer Bender, and Sergeant McGuire[1]) about being housed with federal detainees, who were held in the jail pursuant to a contract with the U.S. Bureau of Prisons.  Sergeant McGuire eventually told him the matter was not under his control. (Dep. Tr. 34-35.)  Plaintiff claims that he sent a letter to Warden Amicucci, dated November 5, 2004, which advised the warden that Patrick was afraid of being assaulted by "federal inmates," and that he had "witnessed local county inmates being assaulted by federal inmates."  (See

---

[1] Defendant "Correctional Officer John Doe" has not been identified or served, and the defendants' motion is not on his behalf.

Hogan Felix Decl. Ex. C.[2])  In the letter, Patrick did not state that he feared or anticipated an attack by Hill, who was a federal detainee, or any other particular federal detainee, nor did Patrick file a formal grievance about being housed with federal inmates.  (Id.)  Warden Amicucci did not respond to this letter.

Following the assault, Patrick was taken first to the jail clinic and then to the Westchester Medical Center Emergency Room for further treatment.  After a CAT scan and other tests, Patrick was advised that surgery was required.  He asked for time to think and consult with his family before deciding whether to have surgery; the doctor advised him not to take too much time because the injuries needed to be dealt with.  (Dep. Tr. 73-74.)  The next day, November 23, 2004, Patrick advised corrections personnel that he consented to surgery.  The surgery was scheduled shortly thereafter and was performed ten days later, on December 3, 2004.

Since the time of the surgery, Patrick has received pain medication regularly, yet he claims that he continues to suffer severe pain and other symptoms related to his injuries, including headaches, blurred vision, twitching, and reduced sensation on the left side of his face. (Dep. Tr. 22.)  He has been told by his treating physician that he will always experience some discomfort as a result of his injuries, and will require medication for it.  (Dep. Tr. 114.)  The screws and plate remain in his face.  (Dep. Tr. 85.)

Patrick filed this complaint on June 1, 2005, making two claims pursuant to 42 U.S.C. § 1983.  The first claim was based on the defendants' alleged failure to protect him from the assault he had suffered; the second arose from the medical treatment (or lack thereof) he

---

[2] A version of this letter appears, along with other exhibits, between pages 3 and 4 of plaintiff's complaint.  Plaintiff acknowledges, however, that this is not the actual letter, but his attempt to recreate it.  (Dep. Tr. 38.)

subsequently received.  Defendants moved for summary judgment.  Patrick moved for the

appointment of counsel; this motion was denied by order dated August 9, 2006, renewed, and

denied again in a second order dated September 29, 2006.[3]  Accordingly, Patrick filed a response

to the motion, and the matter is now fully briefed and ready for the Court's consideration.

## DISCUSSION

### I.   Summary Judgment Standard

In considering a motion for summary judgment, all ambiguities must be resolved in favor

of the nonmoving party, although "the non-moving party may not rely on conclusory allegations

or unsubstantiated speculation."  Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).  The

court "is not to weigh the evidence but is instead required to view the evidence in the light most

favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of

that party, and to eschew credibility assessments."  Weyant v. Okst, 101 F.3d 845, 854 (2d Cir.

1996).  Summary judgment is appropriate if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits . . . show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).

---

[3] Plaintiff's summary judgment papers accuse the defendants of failing to provide
necessary discovery.  The information which defendants allegedly failed to provide consists of
(1) log book reports demonstrating that the security camera in the relevant area was broken at the
time Patrick was assaulted; (2) the number of federal inmates located in each housing unit; and
(3) pictures of the housing unit where the assault happened.  For purposes of this opinion, the
Court has assumed that the camera was broken and that the assault happened as Patrick
described it, so the first and third requests would make no difference.  Nor is there any way in
which the number of federal inmates in any housing unit could affect the disposition of this
motion.  Accordingly, even if Patrick is correct that defendants failed to comply with their
discovery obligations, no intervention by the Court is required at this point.

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The court must view the record in the light most favorable to the nonmoving party when making this determination.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  The opposing party must then show that a genuine issue of material fact exists.  Celotex, 477 U.S. at 322.  "If the evidence [produced by the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249-50 (internal citations omitted).  "The mere existence of a scintilla of evidence in support of the non-movant's position will be insufficient: there must be evidence on which the jury could reasonably find for the [non-movant."  Pocchia v. NYNEX Corp., 81 F.3d 275, 277 (2d Cir. 1996) (internal citations, alterations and quotation marks omitted).  Similarly, "mere allegations or denials" of the movant's factual assertions, the non-movant's pleadings, or conclusory allegations are insufficient to demonstrate a genuine issue of material fact.  Fed. R. Civ. P. 56(e).

When a party is proceeding pro se, as in the present case, a court is obligated to "read [] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest."  Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).

## II.    Failure to Protect

Plaintiff's first claim arises from the defendants' failure to prevent the assault.  While the Eighth Amendment, which Patrick's complaint invokes, applies only to convicted prisoners, the Due Process Clause of the Fourteenth Amendment comparably protects pre-trial detainees against intolerable prison conditions.  Weyant, 101 F.3d at 856. "[I]t is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."  Id. at 856.  Courts have

therefore applied the same Eighth Amendment standards to the deliberate indifference claims of pre-trial detainees.  Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983).

The Eighth Amendment's prohibition of cruel and unusual punishment requires prison officials to ensure that inmates receive the necessities of life, including medical care, and that they "take reasonable measures to guarantee the safety of inmates."  Farmer v. Brennan, 511 U.S. 825, 832 (1984).  "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment" and is the basis of a failure-to-protect claim."  Id. at 828.  In order to demonstrate deliberate indifference in a prison official's failure to protect an inmate, it must be shown that the prison official have "knowledge that an inmate faces a substantial risk of serious harm and . . . disregard[ed] that risk by failing to take reasonable measures to abate the harm."  Lee v. Artuz, No. 96 Civ. 8604, 2000 WL 231083, at *5 (S.D.N.Y. Feb. 29, 2000), quoting Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996).

"[D]eliberate indifference embodies both an objective and a subjective prong." Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).  To establish a violation of his rights, an injured inmate must show not only that he was exposed to a substantial risk of serious harm but also that the defendant officials acted with deliberate indifference to his health or safety.  To be liable, the official must "know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837. Because both subjective and objective elements must be present in a cognizable claim for failure-to-protect, "[i]t is not . . . every injury suffered by one prisoner at the hands of another that translates into constitutional liability."  Id. at 834.

Prison officials have been held liable when they are on notice of a substantial risk of serious harm to an inmate and fail to take reasonable steps to protect him.  Id. at 857.  In the present case, however, there is no evidence that the defendants were aware that Hill, or any other particular inmate, posed a danger to Patrick.  It is undisputed that Patrick never advised defendants of any threat against him.  Patrick stoutly maintains, in fact, that even he was unaware of any danger from, or dispute with, any other prisoner.  There was thus no threat for defendants to ignore, and certainly no awareness on the part of defendants of any risk to Patrick.

Defendants were aware, of course, that Patrick was housed with federal pretrial detainees, and they were also aware that Patrick objected to that arrangement and was afraid of the federal inmates.  Patrick states that this fear was based on his belief that because federal inmates are likely facing more prison time than county inmates, they are more inclined to initiate unprovoked assaults.  In Patrick's view, the time added to a federal inmate's sentence for a disciplinary infraction would be perceived as negligible, and would not serve as a disincentive for violent behavior in the way that it potentially would for a county inmate.  (Dep. Tr. 106-09.)

The record is devoid, however, of any evidence that mixing state and local inmates presented any danger to anyone.  Plaintiff has offered no proof whatsoever that the federal inmates were more dangerous than the local jail population, or posed any notable risk.  The assertions allegedly made in Patrick's letter to the warden that Patrick had seen federal inmates assault other prisoners is not evidence from which a reasonable factfinder could conclude that mixing the populations presented a dangerous situation, any more than the observation that an unspecified number of black prisoners had been observed committing assaults would

7

demonstrate that black prisoners were dangerous as a group, or that maintaining an integrated prison posed an unreasonable risk to inmate safety.

Patrick maintains that other facts support a finding of deliberate indifference.  The corridor in which the assault took place, Patrick claims, was not directly monitored in person or by camera at the time of the attack, as no jail officials were aware that the attack had occurred until Patrick himself approached Officer Bender and notified him of the assault.  After the assault, the sergeant on duty ordered that Hill be locked in his cell pending disciplinary charges, but Patrick claims that another inmate, named Churchill, was able to get into the unmonitored security station and unlock Hill's cell, at which point Hill jumped down from his second-story unit in an apparent effort to get to Patrick where he was standing.  Patrick was able to lock himself into his own cell (on the first floor of the building) before Hill could reach him, but Patrick argues that the fact that he was apparently targeted by Hill for the second time that day, despite the order that Hill be locked in his cell, could support an inference of deliberate indifference.  Patrick further claims that after failing to reach Patrick for a second attack, Hill was able to walk "all the way around through the whole unit to get back to his cell" on the second floor, "right through the unit where everybody . . . was."  (Dep. Tr. 71.)  Apparently, the officer on duty did not notice or did not care that the inmate who had just attacked Patrick was walking freely through the unit, although the unit was "very small."  (Dep. Tr. 67.)

Although Patrick's motion papers do not mention a third incident, the record suggests that Patrick was assaulted again.  The medical records submitted pursuant to this motion indicate that Patrick was hit in the same part of his face, by a different inmate, Wayne Horne, on or about February 25, 2005.  (Hogan Felix Decl. Ex. D; see Dep. Tr. 19.)  The defendants assert that

8

Patrick was in protective custody from the time of the first attack until he was transferred out of Westchester County Jail (Amicucci Aff., Hogan Felix Decl. Ex. B, ¶ 6.)  Thus, a reasonable factfinder could conclude that this additional attack occurred while Patrick was in protective custody.

Patrick was the victim of at least one serious assault, and possibly two.  His testimony, if believed, could paint a grim picture of a detention facility in which inmates open each other's jail cells, inmates who have just attacked other inmates wander freely through common areas against the orders of the guards, and inmates supposedly under special protection are nonetheless attacked.  The evidence does not suggest deliberate indifference, however, as to any of the three incidents.

As to the first attack, plaintiff himself was unaware of any danger from Hill.  As Patrick himself testified, "it would have never dawned on me that this man was gonna hit me."  (Dep. Tr. 46.)  Greater prescience cannot be expected of defendants.  As to Hill's attempt to attack Patrick a second time, it would certainly be disturbing if, as Patrick claims, security was so lax at the jail that one inmate was able to access the guard station and release an inmate held in disciplinary custody, and if the latter inmate was then able to walk freely the length of the unit without being stopped.  But this attempted attack, of course, caused Patrick no injury, and Patrick himself acknowledges that Hill had been ordered into disciplinary custody; in other words, even if the guards failed to keep Hill away from Patrick, they tried to do so.  As to the later assault by Wayne Horne, Patrick does not allege that stricter protective measures should have been taken; far from warning the guards that he was in danger after the first attack, he repeatedly protested the imposition of protective custody (Dep. Tr. 78-79) and reacted forcefully

9

at his deposition to the suggestion that there was a legitimate need for it: "Protection from who? They took the guy away, they locked the guy up, supposedly, so who was I in fear of, I mean, who was gonna bother me now?"  (Dep. Tr. 88.)  Thus, he has not shown (or attempted to show) that the later attack was the result of deliberate indifference.

In short, Patrick's claims relating to the assault or assaults he suffered are essentially claims of negligence, which, however disturbing it may be, does not rise to the level of a constitutional violation.  See Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  Because Patrick has offered no evidence that defendant prison officials were aware of a risk of serious harm, they were not deliberately indifferent to any such risk, and summary judgment will be granted on this claim.

## III.   Failure to Treat

To make a showing of inadequate medical care in violation of the Eighth Amendment's prohibition of cruel and unusual punishment, a plaintiff must demonstrate that defendants acted with "deliberate indifference to [his] serious medical needs" through the intentional "den[ial] or delay[] [of] access to medical care or [that they] intentionally interfered with the treatment once prescribed."  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  To support a claim of deliberate indifference, a plaintiff must show: (1) the objective seriousness of his medical condition, i.e., that he was suffering from "a condition of urgency, [or] one that may produce death, degeneration, or extreme pain," Hathaway, 37 F.3d at 66, and (2) that defendants had a subjectively culpable mind set in treating or failing to treat this condition, i.e., that defendants knew of and disregarded an excessive risk of harm to the inmate.  See Farmer, 511 U.S. at 837.

For a plaintiff to satisfy the objective prong, "more than minor discomfort or injury is required . . . to demonstrate a serious medical need."  Sully-Martinez v. Glover, No. 00 Civ. 5997, 2001 WL 1491278, at *4 (S.D.N.Y. Nov. 26, 2001).  In this case, there can be no question that the injury was sufficiently severe; plaintiff's face required major surgery, the plates and screws implanted during the surgery will remain there for the rest of his life, and his pain continues to this day.  (Dep. Tr. 82-85.)

As to the subjective prong, the defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference."  Farmer, 511 U.S. at 837.  A plaintiff "is not required to show that the defendant acted for the 'very purpose of causing harm or with the knowledge that harm will result.'"  Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003), quoting Farmer, 511 U.S. at 835.  However, "a prisoner's disagreement with the diagnostic techniques or forms of treatment employed by medical personnel does not itself give rise to an Eighth Amendment claim."  Troy v. Kuhlmann, No. 96 Civ. 7190, 1999 WL 825622, at *6 (S.D.N.Y. Oct. 15, 1999).  "In fact, even negligence constituting medical malpractice does not violate the Eighth Amendment."  Sully-Martinez, 2001 WL 1491278, at *4, citing Gamble, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").  Delay in providing an inmate access to medical care may constitute cruel and unusual punishment in violation of the Eighth Amendment, Kaminsky v. Rosenblum, 929 F.2d 922, 926 (2d Cir. 1991), provided that "the deprivation of medical attention [is] 'sufficiently serious' . . . [and] the charged official . . . act[s] with a sufficiently culpable state of mind."  Hathaway, 99 F.3d at 553.

11

Both parties acknowledge that Patrick received immediate medical attention after the attack.  He was promptly taken to a hospital, diagnosed, treated, and advised as to the surgery and recommended treatment.  It is also common ground between plaintiff and defendant that Patrick himself decided to wait before agreeing to surgery, but that by the next day he had advised prison officials that he wanted the surgery.  Nor is there any dispute that Patrick agreed to the physician's recommended course of treatment one day after the medical examination following the attack.  Ten days later, Patrick received surgery for his injuries.

Based on the record in the present case, it cannot be disputed that Patrick's condition was of a serious nature.  It is unclear, however, whether the doctor's initial statement to Patrick that he should not wait "too long" to decide whether to have the surgery (Dep. Tr. 75) indicated that Patrick's need for surgery was emergent and that the surgery needed to be performed immediately.  The notes of William Gagnon, the physician's assistant who was on duty the morning of November 25, 2004, state that the surgery was not considered an emergency, and that he explained that to Patrick.  However, it is not clear that Gagnon's assessment reflected the view of Patrick's treating physician at Westchester Medical Center.  Patrick understood the doctor's instructions to mean that the surgery needed to be performed right away; as he testified, "for an emergency like that, you don't have to make an appointment, they just take you to the hospital." (Dep. Tr. 75.)

Defendants have submitted no evidence conclusively demonstrating that Patrick's understanding of the urgency of his condition is wrong.  Nor is it impossible to imagine a reasonable factfinder concluding that a prison official is deliberately indifferent to a serious medical condition if he makes a prisoner wait ten days before operating on a wound so serious

that "the doctors said that if they didn't fix [it], my eye would just fall down inside my . . . face." (Dep. Tr. 81.)  Cf. Liscio v. Warren, 901 F.2d 274, 277 (2d Cir. 1990) (failure to examine inmate going through "life-threatening" and "fast degenerating" condition for three days could constitute deliberate indifference).  On the present record, therefore, it cannot be said that there is no genuine issue of material fact as to whether defendants' failure to arrange surgery in less than ten days represents deliberately indifference to Patrick's condition.[4]

The conditions in which Patrick claims to have been housed after the attack, moreover, could provide further support for an inference that defendants were deliberately indifferent to his medical needs, because those conditions as Patrick describes them could be seen by a reasonable juror as inconsistent with any desire for him to recover.  During the ten-day period after Patrick decided to have surgery but before the procedure was performed, he complained of "massive pain," and claims that he was housed in an isolated cell that had a broken window, was "unsanitary with no heat or water," and was generally unsuitable for his injured condition.  (Pl. Aff. in Resp. to D. Mot. for Summ. J.).  Patrick asserts that instead, he should have been housed in the Ward 29 infirmary, where he could have received appropriate care.  (Dep. Tr. 75-76.) While in the isolated unit, Patrick states that "23 hours a day I was locked in my cell . . . [I]t wasn't so much being locked up, but I needed care, I needed treatment . . . and I wasn't getting

---

[4] There appears to be a significant question as to whether any of the named defendants were personally involved in any of the decisions related to plaintiff's medical treatment.  See Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (discussing § 1983's requirement of personal involvement).  Although defendants move for summary judgment on the basis of personal involvement, however, their arguments pertain entirely to personal involvement in the facts surrounding the assault, not the subsequent medical treatment.  Accordingly, this opinion will not consider further the question of whether the defendants were personally involved in the decisions related to plaintiff's medical treatment.

13

that treatment.  They had me in this filthy cell . . . and it was just bad, it was really bad, and I

don't understand that."  (Dep. Tr. 79.)

Following his surgery on December 3, 2004, Patrick states that he was placed in the

Ward 29 infirmary for less than a day, and was then moved to a cell in the "old jail."  (Dep. Tr.

86.)  Patrick alleges that this cell was also isolated, unheated, "dirty, infested, [and there was]

piss everywhere."  (Dep. Tr. 103.)  He was held in this cell on "key lock," he claims, for a period

totaling 97 days.  (Dep. Tr. 87.)   Patrick claims that he was in constant pain at that time, and that

he put in requests to see the nurse, but was left in the cell to receive medication when rounds

were made with the medication cart.  (Dep. Tr. 102.)[5]

The record contains numerous "sick call requests," i.e., requests for medication, which

could support an inference that he did not always receive his medication in a timely manner.

(Hogan Felix Decl. Ex. D.)  When Patrick requested a grievance to challenge his housing

arrangements, he was told "no grievances" a second time, and was also denied access to the

library.  (Dep. Tr. 103-04.)  All of these allegations could support a reasonable factfinder's

---

[5] It is unclear from the record whether this housing assignment constituted protective custody and was meant to shield Patrick from further risk of injury, as defendants contend, or whether he was being disciplined in some fashion.  Patrick claims that throughout his confinement in this isolated unit, no formal hearing was held, nor was he ever informed of "why [he] was being locked down."  (Dep. Tr. 88.)  He claims to have been told by the sergeant that if he did not want to be there, he could "just sign the paper and we'll take you out of here."  (Dep. Tr. 78.)  Patrick claims, however, that he "signed the paper and [] sent it to them" and "to the warden" (id.), but that he was not placed in better conditions.  He claims that he subsequently asked for a grievance and was told that "they have no grievance."  (Dep. Tr. 79.)  Patrick also claims to have been written up for asking questions to the nurses regarding his condition, and that this violates jail policy.  (Dep. Tr. 119.)

14

conclusion that defendants were deliberately indifferent to Patrick's condition and his medical need for appropriate treatment. Thus, summary judgment must be denied on Patrick's second claim.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment (Doc. # 16) is granted in part and denied in part. In light of this ruling, plaintiff is invited to renew his application for the appointment of counsel if he so desires.


Dated: New York, New York
       March 15, 2007

                                    SO ORDERED:

                                    _____
                                    GERARD E. LYNCH
                                    United States District Judge

15